# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**CHRISTINA L. NUZUM,**

      **Plaintiff,**

   v.                                      **Civil Action 2:17-cv-521**
                                              **Judge George C. Smith**
                                              **Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Christina L. Nuzum filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying her Title II Disability Insurance Benefits application. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 10) be **OVERRULED**, and that judgment be entered in favor of Defendant.

**I.**     **BACKGROUND**

Plaintiff filed her application for benefits on June 4, 2013, alleging that she has been disabled since July 26, 2012 due to herniated discs, sciatica, fibromyalgia, progressive nerve damage, and neuropathy. (Tr. 166–68, PAGEID #: 203–05). Plaintiff later amended her onset date to May 31, 2013, the date she stopped working full-time. (Tr. 22, PAGEID #: 56). Plaintiff was denied benefits on October 15, 2013 (Tr. 105–09, PAGEID #: 141–45), and upon reconsideration on February 11, 2014 (Tr. 111–14, PAGEID #: 147–50). Plaintiff filed a Request for Hearing on April 1, 2014 (Tr. 115–16, PAGEID #: 151–52), and an administrative hearing by video was held on December 3, 2015 (Tr. 41–72, PAGEID #: 75–106).

Administrative Law Judge Christopher Tindale (the "ALJ") denied Plaintiff's claim in a decision issued on February 11, 2016. (Tr. 19–40, PAGEID #: 53–74). The Appeals Council denied Plaintiff's request for review on February 16, 2017, adopting the ALJ's decision as the Commissioner's final decision. (Tr. 5–10, PAGEID #: 39–44).

Plaintiff filed this case on June 16, 2017 (Doc. 1), and the Commissioner filed the administrative record on August 28, 2017 (Doc. 7). Plaintiff filed a Statement of Specific Errors on October 19, 2017 (Doc. 10), and the Commissioner responded on November 29, 2017 (Doc. 11). Plaintiff did not file a reply.

### A. Relevant Hearing Testimony

Plaintiff testified that she was born on July 3, 1975, and was 40 years old on the date of the hearing. (Tr. 49, PAGEID #: 83). She is married and has three children, who at the time of the hearing were 17 years old (twins) and 15 years old. (Tr. 50, PAGEID #: 84). Plaintiff earned a GED and had some college. (*Id.*).

Plaintiff stated that her medical impairments began on August 26, 2011, which she referred to as "the day [her] life ended." (Tr. 51, PAGEID #: 85). She explained:

> I was in nursing school, sitting in class. It was about 9:30 at night. And I had this terrible pain in my left breast. It felt like there was a vice grip squeezing it. And I could feel the heat from about six inches away. And it didn't go away so I left class and I went to the emergency room. They did X-rays, put me on antibiotics, [said] that I had mastitis, which I'd never breast fed before and my kids were teenagers. So then they sent me for an MRI. But by the next day my breast wasn't hurting anymore, the pain had gone from my breast up underneath my arm pit and wrapped up to the base of my skull. And within two days the pain was all the way from the base of my skull down to the heels of my feet on the backside, nothing on the front side. It's excruciating pain, it's something—it's like I've never had a tooth ache but I imagine a tooth ache that just drive you crazy to the point where you just—you want to rip it out. And eventually that got worse, and then I started getting pains from my elbows to my fingertips where my arms burn, my hands go numb. They cramp up where if I'm holding something smaller my hands cramp up and I have to use my other hand to open it.

(Tr. 51–52, PAGEID #: 85–86). Plaintiff testified that this condition led to a spinal cord stimulator implant inserted for pain management. (Tr. 52–53, PAGEID #: 86–87). Plaintiff explained:

> Q. Did any doctors ever pinpoint exactly where [they] thought [the pain] was coming from?
>
> A. T-9 and T-10 was what one neurologist told me that I had herniated discs. But they were interiorly herniated, not posteriorly, so he didn't want to do surgery. But they—him and my pain management doctor, Margolin, decided that the spinal cord stimulator would trick my brain into thinking there wasn't any pain in my body. And it actually allowed my legs to move better.

(Tr. 53, PAGEID #: 87). After the implant, Plaintiff returned to work. (*Id.*). However, Plaintiff eventually stopped working after the success of the spinal cord stimulator waned in 2012 and 2013. (Tr. 53, PAGEID #: 87). Plaintiff believes this occurred because she "was pushing [herself] a little too hard." (*Id.*).

> Plaintiff described the pain she feels as:
>
> like a stiff neck with chronic throbbing. There [are] lumps in my neck, I can feel them. It never goes away, ever. Down my spine it's achy, throbbing, it hurts to twist and bend. My tailbone feels like it's going to fall off, it's a constant ache. It doesn't burn, it aches. The backside of my legs burn from my butt cheeks down to my knees. Just the backside burns. My knees feel like they're going to give out when I walk. When I see stairs I have a panic attack because going up is okay, it takes me awhile. But going down I feel like I'm going to fall. So I hate stairs. And my calves are—it's like a restless leg syndrome but they go numb, and I can't feel the last two toes on either of my feet, and that's always. So every day—[my attorney] said that I had good days and bad days. Every day's a bad day. Every day's a bad day but some days are just a little bit better than yesterday. Every night when I go to sleep I pray that tomorrow's going to be better. And every morning when I wake up it's the same thing.

(Tr. 53–54, PAGEID #: 87–88). She also stated that her hands go numb and "won't work," and that she has been diagnosed with carpal tunnel syndrome. (Tr. 54, PAGEID #: 88; Tr. 59,

PAGEID #: 93). Plaintiff also takes medication for psoriasis and suffers from anxiety and depression. (Tr. 59–61, PAGEID #: 93–95).

Plaintiff testified that she lies on the couch approximately 18 to 20 hours per day (Tr. 55, PAGEID #: 89), and gets four to eight injections in her upper back monthly (Tr. 56, PAGEID #: 90). Plaintiff's pain medications ease her pain enough for her "to get up and not be so angry at [herself]," but they also cause her stomach problems. (Tr. 57–58, PAGEID #: 91–92). Plaintiff is unable to go grocery shopping unless it is for one item. (Tr. 57, PAGEID #: 91). She has past work as a dental assistant. (Tr. 65–67, PAGEID #: 99–101).

Plaintiff testified that she can stand for approximately 15 minutes, walk for approximately 20 to 25 minutes, and sit for approximately 30 minutes. (Tr. 57–58, PAGEID #: 91–92). She maintains a driver's license and can drive short distances. (Tr. 58, PAGEID #: 92).

A Vocational Expert (the "VE") also testified at the hearing, stating that Plaintiff was incapable of performing her past work. (Tr. 67, PAGEID #: 101). However, a hypothetical person of Plaintiff's age, education, work history, with her residual functional capacity ("RFC") could perform unskilled, light work, such as an inspector, mail clerk, and routing clerk. (Tr. 67–68, PAGEID #: 101–102). The VE testified that, if the hypothetical person's exertional level was reduced to sedentary, she could perform jobs such as inspector and bench assembler. (Tr. 68, PAGEID #: 102).

The VE testified concerning additional limitations as follows:

Q. If I was to add a limitation of frequent handling and fingering bilaterally, would that change any of the previous jobs you'd indicated in hypothetical one or two?

A. No sir. All jobs and numbers would remain the same.

Q. If I changed that to only occasional handling and fingering, would that change any of those jobs?

4

> A. Yes, sir, that would be work preclusive.
>
> Q. If I was to change the climbing of ramps and stairs to occasional, would that change anything?
>
> A. No, sir, it would not.
>
> Q. And if I was to allow that individual to alternate between sitting and standing every 30 minutes while remaining at the work station and would not be off task more than five percent of the work period, would that change any of those jobs?
>
> A. The sedentary would remain, jobs and numbers. However, the light level jobs, the numbers would be reduced 50 percent, jobs would remain the same. And that opinion's based on placement experience.
>
> Q. And if I was to include a limitation that the individual would be off task at least 20 percent of the workday, would there be any jobs?
>
> A. No, sir, that would be work preclusive as well, based on placement experience.
>
> Q. And what percentage of off task is acceptable?
>
> A. Up to 10 percent. Anything beyond that is work preclusive, in my experience again.
>
> Q. And if I was to include a limitation that the individual would miss more than four days of work per month, would there be any jobs?
>
> A. No, sir. They're preclusive as well, based on placement experience.
>
> * * *
>
> Q. [BY ATTORNEY]: [I]f you took the judge's first hypothetical and his second hypothetical, light and sedentary, and we simply added that they would need a sit/stand option at will, based on their pain level. Would that make any difference to your answers?
>
> A. Yes, ma'am. An at-will would most likely take her off task beyond the 10 percent. I believe that would be work preclusive.

(Tr. 68–70, PAGEID #: 102–04).

5

### B. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements through December 31, 2017, and that she has not engaged in substantial gainful activity since May 31, 2013, her alleged onset date. (Tr. 24, PAGEID #: 58). The ALJ determined that Plaintiff suffers from the following severe impairments: "degenerative changes in the spine; chronic pain secondary to fibromyalgia versus a chronic pain syndrome versus a possible unspecified neuropathy; a somatoform disorder; and an affective disorder...." (*Id.*). Concerning Plaintiff's chronic pain, the ALJ stated:

> this decision included several conditions noted at different points throughout the records because the etiology of her chronic pain does not appear settled. Primary care providers and pain management doctors have variously treated the claimant for fibromyalgia, chronic pain syndrome, and/or myofascial pain syndrome (*See* Exhibits 6F; 7F; 20F; 21F; 22F; 23F; 24F). One of the claimant's primary care providers also suspected her chronic pain stemmed from underlying multiple sclerosis, but consultation with a neuro-ophthalmologist ruled out this diagnosis. (*See* Exhibits 5F, p. 2-13; 7F, p. 7–10; 8F). The neurological consult did, however, suggest the claimant's complaints may relate to a demyelinating neuropathy associated with an illness in August 2011 (Exhibit 8F). An EMG in April 2014 similarly noted evidence of possible peripheral neuropathies in the claimant's lower extremities, but the testing was inconclusive and results were limited by her tolerance for the testing (Exhibit 19F, p. 2–6). There has nevertheless been no definitive neurological diagnosis to date and the claimant has not had any ongoing neurological work-up. This decision has therefore decided to address the claimant's complaints of chronic pain broadly irrespective of the precise etiology of these complaints.

(Tr. 25, PAGEID #: 59). The ALJ found Plaintiff's other impairments to be non-severe. (*Id.*).

The ALJ examined Listings 1.04 (disorders of the spine), 12.04 (affective disorders), and 12.07 (somatoform disorders), but determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 26, PAGEID #: 60). In examining whether Plaintiff satisfied the requirements of Listings 12.04 and

6

12.07, the ALJ noted that Plaintiff has no more than a mild restriction in her activities of daily living. (*Id.*). The ALJ stated:

> The limitations the claimant has alleged in this realm of functioning relate to physical, not psychological, issues. There are nevertheless reports indicating that the claimant prepares meals for her family (husband and three children), does laundry for her family, washes dishes, drives her children to and from school on a daily basis, shops for groceries once per week, takes care of pet dogs, and maintains her personal care without difficulty. (Exhibits 4E; 9E; 4F, p. 1; 9F, p. 1).

(*Id.*). The ALJ also examined Plaintiff's social functioning and determined:

> [T]he claimant has no more than moderate difficulties. The claimant has reported some mood problems and has indicated that she generally does not leave her residence. However, the claimant did not report any problems getting along with others in either of her function reports (Exhibits 4E, p. 6; 9E, p.9). There are also several references to the claimant attending sport practices or games and other social events for her children. (*See* Exhibits 4E, p. 5; 9E, p. 8; 14F, p. 6–7).

(*Id.*).

Upon review of the record, the ALJ found that Plaintiff maintained:

> [T]he [RFC] to perform light work as defined in 20 C.F.R. 404.1567(b) except for the following limitations. The claimant can never climb ladders, ropes, or scaffolds, but she can occasionally climb ramps and stairs. The claimant can occasionally stoop, kneel, crouch, and crawl. The claimant can frequently handle and finger. The claimant must avoid concentrated exposure to vibration and all exposure to hazards. The claimant is limited to simple, routine, and repetitive tasks in a work environment free of fast paced production race or pace work. The claimant is limited to occasional and superficial contact with the public, coworkers, and supervisors. The claimant must work in a low stress environment, defined as making only occasional changes in the work setting and no more than occasional decision-making.

(Tr. 27, PAGEID #: 61).

The ALJ likewise found that, although Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged systems, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. (Tr. 28, PAGEID #: 62). Specifically, the ALJ found that the objective medical evidence undermined

7

Plaintiff's credibility concerning, *inter alia*, her chronic pain. (Tr. 29, PAGEID #: 63). To that end, the ALJ stated:

> While the record suggests that the claimant has some legitimate issues with chronic pain, treatment records are inconsistent with the level of severity she has reported. Dr. Leon Margolin, a pain management physician, has been the claimant's main source of treatment for her complaints of chronic pain from late 2012 through the present (See Exhibits 6F; 20F; 21F; 22F; 23F; 24F). This treatment has consisted of injection-based therapies and a regimen of pain medications—including narcotic pain relievers—that has remained largely unchanged for the past couple years. (*See id*). Notes from Dr. Margolin indicate that this treatment regimen has been rather successful in mediating the claimant's pain with the claimant typically reporting average pain levels between 2 to 4 out of 10—i.e., mild to moderate pain—at least until August 2015 (*See id.*).
>
> The claimant began reporting a minimal increase in her pain levels (3 to 5 out of 10) around September 2015, although there are no intervening issues that clearly explain this reported increase in pain. (*See* Exhibit 24F). In addition, Dr. Margolin's treatment records repeatedly indicate that she denied side effects from her medications despite claiming she had a number of adverse side effects at the hearing (*See* Exhibits 6F; 20F; 21F; 22F; 23F; 24F)

(Tr. 29–30, PAGEID #: 63–64) (footnote omitted). The ALJ likewise found that non-medical evidence undermined Plaintiff's credibility, stating:

> Another reason that claimant's allegations are not entirely credible is that evidence indicates that she has maintained a significant level of activity since her alleged onset date. Although the claimant alleged she was quite limited at the hearing, her initial reports indicated that she handled meal preparation for her husband and three teenage children, did laundry for her family, washed dishes, drove her children to and from school on a daily basis, shopped for groceries once per week, took care of pet dogs, and maintained her personal care without difficulty (Exhibits 4E; 9E; 4F, p. 1; 9F, p. 1–2, 4). There are also references to the claimant driving 2.5 hours at least once per month when visiting Dr. Margolin despite testifying that she drives only short distances. (*See* Exhibit 10F, p. 8–9). Several sources, including the claimant's own written reports, also note that the claimant attends her children's sports practices and/or games and other social events in spite of her testimony that she does not engage in such activities (Exhibits 4E, p. 5; 9E, p. 8; 14F, p. 6–7). When the claimant first pursued mental health care in mid-2014, she stated she enjoys engaging in water sports and dancing (Exhibit 11F, p. 8). Multiple medical providers have observed that the claimant appears "very tan" during summer months, which, at the very least, conflicts with her testimony indicating she spends the vast majority of her day sitting or lying down on her couch (*See, e.g.*, Exhibits 10F, p. 4–5; 14F, p. 4–7).

8

(Tr. 30–31, PAGEID #: 64–65) (footnote omitted).

After weighing the opinion evidence, the ALJ determined that Plaintiff was unable to perform any past relevant work. (Tr. 33, PAGEID #: 67). He noted that Plaintiff was born on July 3, 1975, and was 37 years old (defined as a younger individual) on the alleged disability onset date. (*Id.*). The ALJ found that Plaintiff has a high school education, is able to communicate in English, and that transferability of job skills was not material to the disability determination. (Tr. 33–34, PAGEID #: 67–68). Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there are jobs that exist in the national economy that Plaintiff can perform. (Tr. 34, PAGEID #: 68). Thus, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security Act, from May 31, 2013, through the date of the decision. (Tr. 35, PAGEID #: 69).

## II. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To that end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 1:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

### III. DISCUSSION

In her sole statement of error, Plaintiff alleges that the ALJ's credibility analysis was deficient, particularly in light of her severe and chronic pain. (Doc. 10 at 9). More specifically, Plaintiff faults the ALJ for improperly "minimiz[ing] the supportive evidence of record" by, for example, placing it in a footnote. (*Id*. at 11). Plaintiff further contends that "the ALJ's inappropriate reliance on the lack of objective medical evidence to discount [Plaintiff's] allegations of pain and limitations, while minimizing objective evidence that supported her allegations, was reversible error particularly since the pain at issue bears a resemblance to fibromyalgia, which the ALJ noted and accepted as a possible cause of [Plaintiff's] pain." (*Id*.). Plaintiff likewise argues:

> when the ALJ addressed Nuzum's daily activities, he discredited her testimonial allegations through reliance on forms that she had completed in the initial stage of her claim, on July 13, 2013 and December 27, 2013, two years prior to her administrative hearing (Tr. 30–31 referencing Tr. 214–25, 248–62), and isolated statements reportedly made at consultative examinations two years prior to the administrative hearing (Tr. 30–31, referencing Tr. 302, 385–86, 388). The ALJ found that Nuzum's driving two and one-half hours to a pain clinic for treatment contradicted her testimony that she could only drive for thirty minutes (Tr. 31), although her testimony was actually that she could only drive thirty minutes before she needed to stop and get out and stretch (Tr. 59). The ALJ also noted that Nuzum told a mental health professional in mid-2014 that she "enjoys engaging in water sports and dancing," (Tr. 31) when, in fact, there is no context for that statement which was hand written by the provider on an intake form (Tr. 422). The ALJ noted that multiple medical providers (he cited two) have observed that Nuzum is very tan in the summer months, stating that such fact contradicted her testimony that she lies down inside, without asking her for an explanation, which could involve factors other than outdoor activities (Tr. 31).

(*Id*. at 12–13). Based on the foregoing, Plaintiff argues that the ALJ's inadequate consideration of her testimony and statements regarding the severity of her symptoms "was egregious" and warrants remand. (*Id*. at 13).

At the time of the ALJ's decision, SSR 96-7p, 1996 WL 374186 (July 2, 1996), governed the ALJ's analysis of the credibility of Plaintiff's statements concerning her symptoms. That ruling was later superseded by SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), which eliminated the use of the term "credibility" in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2016 WL 1119029 at *1. The new ruling directs the ALJ to look at whether the claimant's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record. *Id.*, 2016 WL 1119029 at *7. Although the Sixth Circuit has declined to determine if SSR 16-3p is retroactive, it has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016). In this instance, however, neither party argues that applying SSR 16-3p over SSR 96-7p would change the outcome, and the Court finds that the ALJ's decision is supported by substantial evidence under either standard.

Here, the ALJ acknowledged that Plaintiff "has some legitimate issues with chronic pain," but found her treatment records "inconsistent with the level of severity she reported." (Tr. 29, PAGEID #: 63). The ALJ determined that Dr. Margolin was the pain management physician primarily treating Plaintiff's complaints of chronic pain since 2012, and that his treatment with injections and narcotic pain relievers had remained unchanged "for the past couple years." (*Id.* (citing Exhibits 6F; 20F; 21F; 22F; 23F; 24F)). The ALJ further noted that Dr. Margolin's treatment records demonstrated that she suffered no side effects from her medications, and that his approach "ha[d] been rather successful in mediating the claimant's pain with the claimant typically reporting average pain levels between 2 to 4 out of 10—i.e., mild to moderate pain—at

least until August 2015." (*Id.*). The ALJ did not overlook Plaintiff's reporting of a minimal increase in her pain levels (3 to 5 out of 10) around September 2015, but he found that the record reflected "no intervening issues that clearly explain this reported increase in pain." (Tr. 30, PAGEID #: 64 (citing Exhibit 24F)).

Plaintiff argues that the ALJ's analysis was deficient because her pain "bears a resemblance to fibromyalgia," even though she does not claim to have established fibromyalgia as a medically determinable impairment. (*See* Doc. 10 at 11); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (stating that Plaintiff bears the burden of proving the existence of a severe, medically determinable impairment). Indeed, the ALJ determined that "the etiology of [Plaintiff's] chronic pain" was unsettled. (Tr. 25, PAGEID #: 59). Hence, the ALJ found Plaintiff's severe impairments to include "chronic pain secondary to fibromyalgia versus a chronic pain syndrome versus a possible unspecified neuropathy." (Tr. 24, PAGEID #: 58; *see also* Tr. 25, PAGEID #: 59 (noting that Plaintiff's "[p]rimary care providers and pain management doctors have variously treated the claimant for fibromyalgia, chronic pain syndrome, and/or myofascial pain syndrome")). Importantly, Plaintiff does not argue that the ALJ's failure to classify her fibromyalgia as a severe medical impairment is unsupported by substantial evidence, and she even acknowledges that her pain is "perhaps *not* attributable to" that disease. (Doc. 10 at 13) (emphasis added).

Based on the foregoing, it is unclear why Plaintiff faults the ALJ for not evaluating her credibility as though she had established a severe impairment of fibromyalgia. Consideration of whether an individual's fibromyalgia can be the basis for a disability finding is governed by SSR 12-2p, 2012 WL 3104869 (July 25, 2012), which provides specific guidance on how to apply the rules when dealing specifically with an individual asserting disability based on that an "elusive"

12

and "mysterious" disease. *Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 399 (6th Cir. 2016); *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). Plaintiff fails to demonstrate that SSR 12-2p is applicable here and, even if it were, that she satisfies its criteria.

Further, the fact that the "ALJ acknowledged findings supportive of [Plaintiff's] allegations" in a footnote and referred to them as "rare instances where providers noted additional abnormalities," does not, as Plaintiff argues, render his decision unsupported by substantial evidence. (Doc. 10 at 11) (citing Tr. 29, n.2, PAGEID #: 63); *see, e.g.*, *Ortiz v. Comm'r of Soc. Sec.*, No. 1:14-cv-2845, 2015 WL 6742082, at *7 (N.D. Ohio Nov. 2, 2015) (observing that the ALJ included the complete definition of sedentary and light work in a footnote); *Ramon v. Colvin*, No. 1:12-cv-2213, 2013 WL 4511879, at *5, n. 40 (N.D. Ohio Aug. 16, 2013) (noting the ALJ provided additional support for reasons given in a footnote). The relevant regulations do require the ALJ to address all the evidence in the written decision. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Here, the record reflects that the ALJ considered the record evidence and his findings demonstrate that he resolved conflicts with Plaintiff's testimony. *Id*.

The Sixth Circuit has held that the Court must accord great deference to an ALJ's credibility assessment, particularly because the ALJ has the opportunity to observe the demeanor of a witness while testifying. *Jones*, 336 F.3d at 476. To that end, it is not the province of the reviewing court to "try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In this case, the ALJ set forth the various factors that he considered in his credibility assessment, including specific citations to medical records and medical source opinions, objective clinical findings, treatment regimen, medication use, and observations at the hearing and activities, and

the ALJ's determination has support in the record. (*See* Tr. 28–31, PAGEID #: 62–65). Consequently, the ALJ complied with the regulations, and his decision is supported by substantial evidence.

## IV. CONCLUSION

Based upon the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 10) be **OVERRULED**, and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.

Date: January 31, 2018                        /s/ Kimberly A. Jolson
                                                                    KIMBERLY A. JOLSON
                                                                    UNITED STATES MAGISTRATE JUDGE